UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,

    Plaintiff,

  - against -

RAHEEM BERT, also known as "Raheem
Linwood" and "Radio"

    Defendant.
------------------------------------------------------------X

**MEMORANDUM & ORDER**
12-CR-100 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

  Defendant Raheem Bert moves to suppress certain statements he made in connection with his arrest by the New York City Police Department ("NYPD") on January 19, 2012, and his transfer to federal custody on January 30, 2012.  For the reasons below, defendant's motion is denied in all respects.

## FINDINGS OF FACT

  **I.**  **The Suppression Hearing**

  The Court held a suppression hearing at which six witnesses testified: Officer John Fahim, Officer Besim Pelinku, Officer Justin Feldman, Detective Lisa Bergen, Special Agent Nelson Crespo, and Investigator Philip Martin.  Defendant did not testify at the hearing.[1]

  As a threshold matter, the Court finds all of the witnesses credible.  As for the Government's witnesses, upon whom the Court principally relies, the Court carefully observed and assessed the demeanor of these witnesses, all of whom testified in a responsive and forthright manner.  Police Officers John Fahim and Besim Pelinku, in particular, provided

---

[1] In this Memorandum and Order, the Court relies on a corrected transcript of the suppression hearing.  The Government moved to correct the transcript (Doc. No. 45), and after a hearing held on January 16, 2013 and full briefing by the parties (Doc. Nos. 46, 49 and 50), the Court granted the Government's motion for the reasons stated on the record at a conference held on January 18, 2013.

testimony that was consistent and mutually-corroborative concerning the material facts at issue. Any differences between the officers' accounts were minor, of the kind one would expect from witnesses to the same fast-moving event, and, if anything, tended to underscore their honesty. Accordingly, the Court credits the testimony of the Government's witnesses and finds as follows.

## II. The 911 Report of Trespassing at 55 Holland Avenue

Officer John Fahim, employed by the NYPD for six years, is currently assigned to the gang division. (Tr. at 10:2–15.) On January 19, 2012, Officer Fahim was assigned to the "Conditions Team" of the 120th Precinct in Staten Island, and as such was assigned to respond to reports of loitering, trespassing, and drug sales. (*Id.* at 10:16–23.) His partner on that day was Officer Besim Pelinku, a five-year veteran of the NYPD. (*Id.* at 91:7–92:1.)

At approximately 9:00 pm, Officers Fahim and Pelinku responded to a radio report of trespassing at 55 Holland Avenue. (Tr. at 10:16–17, 11:3–5.) A security guard working at 55 Holland Ave. had called 911 to report that five black males were trespassing in the lobby and stairwells of the building. (*Id.* at 11:23–25, 169:21–170:7.) The 911 call indicated that one of the trespassers was wearing dark blue sweats and a red baseball hat, and that another was wearing gray sweats and a black jacket, but otherwise did not describe the other three trespassers. (*Id.* at 51:11–16.)

Upon arriving at 55 Holland Ave. the officers were let into the building by two black males who were in the lobby. (*Id.* at 92:12–20.) The officers questioned these men regarding their reason for being in the building, and the men indicated that they did not live in the building. Because the security guard who had placed the 911 call (*id.* at 53:20–54:1) did not wish to press charges against these men, Officer Fahim gave them a warning and instructed them to leave the

building, which they did. (*Id.* at 12:6–11, 93:7–12.) The security guard indicated that additional trespassers may have congregated on the 10th or 12th floors. (*Id.* at 12:15–16, 53:4–7.)

### III. Encounter in the 10th Floor Hallway of 55 Holland Avenue

Officers Fahim and Pelinku then took the elevator to the 10th floor, where they encountered three individuals – defendant, another man, and a woman – standing and talking at the end of the hallway next to an open window, a few steps from the officers. (Tr. at 12:15–25, 13:6, 94:1–7.) Defendant was wearing a black hooded sweatshirt and black sweat pants. (*Id.* at 13:20–21, 56:8–11, 84:22.) The officers took a few steps toward the individuals, and Officer Fahim asked them what their business was in the building. (*Id.* at 39:18–40:8, 42:9–12, 85:9–11.) They responded that they did not live in the building, but were visiting a friend who lived in the neighboring apartment, indicating apartment 10L. (*Id.* at 12:23–25, 60:3–5.) While Officer Pelinku, who was standing in line with the door of apartment 10L, watched defendant and his companions, Officer Fahim knocked on the door of apartment 10L to determine whether these persons were, in fact, visiting the resident of that apartment. (*Id.* at 13:13–15, 47:12–14, 85:12–15, 96:12–13.) Officer Fahim stated that, at this point, defendant and his companions were not free to leave. (*Id.* at 45:12–16.)

A woman answered the door after about 30 seconds, and Officer Fahim asked her if she knew the people standing outside. (*Id.* at 13:14–15, 45:8–11.) The woman either did not answer, or responded that she did not know the people standing outside. (*Id.* at 13:13–15, 96:4–6.) Defendant then said something to the effect of "tell them you know me," whereupon the woman looked out of the doorway and stated that she knew defendant. (*Id.* at 13:13–18, 45:20–22, 62:25, 63:1–11.) Based on these circumstances, in particular, the woman's failure to quickly

confirm that she knew the suspected trespassers, Officer Fahim did not believe that she was telling the truth when she said that she knew them. (*Id.* at 85:16–25.)

During this exchange, defendant was pacing back and forth, and at one point turned his body away from the officers so that he was facing toward the window. (*Id.* at 96:18–23, 106:10–11, 108:14–17.) Thinking this action suspicious, Officer Pelinku drew his firearm, demanded to see defendant's hands, and told defendant to turn around. (*Id.* at 96:24–25, 97:1–4, 105:22–25, 108:18–23.) Defendant complied with this request and turned back around to face Officer Pelinku, but in doing so "bladed" his torso away from Pelinku, kept his arms down at his sides, and kept his hands near his waist. (*Id.* at 97:5–15, 106:12–14, 108:25, 109:1.) As Officer Fahim testified, while he was speaking with the woman in 10L, he saw defendant turn around at about a 45-degree angle, so that Fahim could see defendant's side and left arm. (*Id.* at 13:15–18, 46:11–17, 63:12–21, 64:11–20.)

At the same time that the woman stated that she knew defendant, Officer Fahim saw defendant lift up his sweatshirt revealing a gun, pull the gun out of his waistband, and motion the gun toward the open window. (*Id.* at 13:16–23, 46:13–17, 63:12–25.) At the same moment, Officer Fahim stepped away from the door of the apartment toward defendant, who was drawing closer to the corner between the window and the wall. (*Id.* at 46:18–21, 98:14–15, 109:3–4.) Officer Fahim went to take control of defendant's hands to handcuff him, grabbed defendant's arm, and began to struggle with defendant. (*Id.* at 13:25, 22:4–17, 98:6–7.) At some point during this struggle, Officer Pelinku heard Officer Fahim say, "He's got a gun." (*Id.* at 98:20–22.)

During the struggle, Officer Fahim was holding defendant's arm and pressing it against the open window, above the window opening, to keep the gun away from him. (*Id.* at 28:15–

29:10, 83:16–17, 84:7–10.)  A magazine released from the gun and fell to the ground inside the window, and the gun itself hit the open window and dropped through the opening, falling to the ground outside the window.  (*Id.* at 13:25, 14:1–5, 38:15–25, 39:1–11, 83:18–21, 94:1–13.) Officer Pelinku did not see the gun, but heard a clanging sound and saw the magazine fall to the floor, and also heard Officer Fahim say "[h]e threw it out the window."  (*Id.* at 98:14–99:2.)  The entire struggle – from the time that Officer Fahim first saw the firearm in defendant's waistband until the time defendant dropped the gun out the window – lasted approximately ten seconds. (*Id.* at 26:1–12, 27:3–7.)[2]

Officer Fahim then handcuffed defendant, picked up the magazine that had fallen on the floor and put it in his pocket, and radioed for backup.  (*Id.* at 14:11–13.)  The officers took defendant into the elevator and then downstairs.  Officer Fahim recovered a firearm that had no magazine in it from underneath the window from which defendant had thrown the firearm.  (*Id.* at 14:20–25, 15:1–6.)

### IV. Transport to 120th Precinct

After defendant's arrest on January 19, 2012, Officer Justin Feldman, a six-year veteran of the NYPD also assigned to the 120th precinct, together with his partner, Officer Elvis Pinho, transported defendant from 55 Holland Ave. to the 120th precinct in a marked police vehicle. (Tr. at 111:23–112:5, 115:5–13; *see also* Doc. No. 41 at 4.)  Defendant was not given *Miranda* warnings prior to his transport to the precinct.  On the way, defendant began singing song lyrics and asked the transporting officers where his gun was.  (*Id.* at 113:2–4, 122:3–4.)  Concerned that defendant might still have a gun on his person based on this question, Officer Feldman asked

---

[2] In a subsequent police report that Officer Fahim filed, he indicated, in a field labeled "Force Used," that he had used no force in arresting defendant.  (*See* Def.'s Ex. H; Tr. at 31:21–32:2, 86:17–22.)  Officer Fahim understood the "Force Used" field to apply only to force greater than that necessary to subdue a suspect, such as mace, pepper spray, a baton, or a firearm.  (Tr. at 86:17–22.)

what gun defendant was talking about, to which defendant did not respond.  (*Id.* at 122:5–11.)

Defendant went back to singing, and later stated that if the officers would let him go, he would

tell them where "the other guns" were.  (*Id.* at 113:15–16, 122:12–13.)  Again concerned for his

safety because of the possibility that defendant might have other guns on his person, Officer

Feldman asked defendant what he was talking about.[3]  (*Id.* at 113:18.)  Officer Feldman did not

ask defendant about any other guns before defendant made these statements.  (*Id.* at 122:11–23.)

Officers Feldman and Pinho took defendant into the 120th precinct, where they had him wait

until the arresting officers arrived, and had no further interaction with defendant after dropping

him off at the precinct.  (*Id.* at 114:8–16.)

### V.    Interview at the 120th Precinct

After arriving at the precinct, Officer Fahim took defendant's pedigree information and

offered to let defendant make a phone call, which offer defendant refused.  (Tr. at 15:23–16:8.)

Detective Lisa Bergen, a ten-year NYPD veteran – eight as a police officer and two as a

detective – interviewed defendant.  (*Id.* at 131: 20–24.)

Defendant was seated in an interview room with his right hand handcuffed to a bar on the

wall.  (*Id.* at 144:21–145:8.)  Defendant was informed of his *Miranda* rights at the outset of the

interview, at approximately 10:40 pm on January 19, 2012.  (*Id.* at 16:19–25, 17:1–12, 20–25,

18:1–2, 132:11–18, 133:1–17, 134:4–25, 139:22–25, 140:1–4, 154:16–24.)  Officer Fahim was

present when defendant was informed of his *Miranda* rights, but did not remain for the entire

interview.  (*Id.* at 16:9–20, 133:5–7.)

Detective Bergen observed that defendant was "irritated and aggravated" that he had to

listen to his rights, and told her that he had "heard this all before" and he "just wanted to get on

---

[3] Officer Feldman did not testify regarding whether defendant responded to this second question.

with things." (*Id.* at 135:16–19, 137:5–10.)  Detective Bergen explained to defendant that she had to read him his rights, that he had to listen to what she was telling him, and that if he did not understand she would explain the rights until he understood.  (*Id.* at 135:21–24.)

In administering the warnings, Detective Bergen read from a printed *Miranda* advice of rights form, reading each warning verbatim to defendant.  (*Id.* at 17:20–24, 132:17–18, 133:14–17, 134:4–25, 139:22–25, 140:1–4; *see* Gov. Ex. 1.)  Once defendant confirmed that he understood each warning, Bergen wrote "yes" next to each warning.  (*Id.* at 134:4–25, 135:1–6.)  When Detective Bergen asked defendant the final question on the *Miranda* form – "Now that I have advised you of your rights, are you willing to answer questions.  Do you understand?" – defendant responded "yes," and Bergen wrote "yes" on the form.  (*Id.* at 19:10–12, 135:1–5, 136:1–2.)  Detective Bergen then gave defendant the advice of rights form and asked him to initial each warning and sign his name at the bottom of the form.  (*Id.* at 135:1–6.)  The form reflects that defendant initialed the first five warnings and signed the line at the bottom of the form labeled "Subject," but defendant's initials do not appear next to the waiver question.  (*See* Gov. Ex. 1.)  Detective Bergen and Officer Fahim both saw defendant sign and initial the form.  (*Id.* at 81:7–8, 82:22–24, 135:10–11.)

Defendant did not appear to be intoxicated, under the influence of any substance, or otherwise impaired, during the interview.  (*Id.* at 137:11–13, 144:19–20.)  Detective Bergen indicated that, if she had suspected that defendant was intoxicated or impaired, she would not have questioned him at that time and would have waited until defendant was in a condition to speak with her.  (*Id.* at 137:14–19.)  Defendant gave appropriate answers to Detective Bergen's questions, was coherent throughout the interview, appeared to understand his rights, and gave no indication that he did not understand his rights.  (*Id.* at 18:8–10, 138:11–13, 139:2–14, 144:8–

20.)  No one threatened defendant or raised their voice to him, and defendant did not request a

lawyer or indicate that he did not understand his rights.  (*Id.* at 18:18–25, 19:3–9, 137:23–25,

138:1–10.)

　　　After agreeing to answer questions, defendant made several statements to Detective

Bergen and Officer Fahim.  Defendant asked Detective Bergen whether the police had tested the

gun yet and whether it was operable.  Defendant further stated that, because the magazine was

separate from the gun when Officer Fahim recovered the gun, the police could not charge him

with possessing a loaded firearm.  (*Id.* at 136:4–10.)  Defendant stated that he threw the gun out

the window when he saw the officers, and that there was "no way" the gun could be working

after falling that many floors.  (*Id.* at 136:17–21.)  Defendant also said, in sum and substance, "If

the gun is fucked up, you can't – and it's not operable, you can't charge me with this."  (*Id.* at

136:6–8.)  Defendant  asked Officer Fahim whether Fahim was "going to tell everybody that [he]

found the gun outside, not on [defendant's] possession."  (*Id.* at 79:1–3.)

### VI.　　Events of January 30, 2012

　　　Defendant's case was "adopted" for federal prosecution through the Bureau of Alcohol,

Tobacco, and Firearms ("ATF") on January 30, 2012.  (Tr. at 179:8–13.)  On that day, NYPD

Detectives Ray Martinez and David Joel transported him from Riker's Island to the Eastern

District courthouse, where Special Agent Nelson Crespo, a seven-year veteran agent of ATF, had

arranged with the detectives to take custody of defendant.  (*Id.* at 158:11–16.)  The detectives

transported defendant in the back seat of an unmarked police car, and upon their arrival at the

Eastern District, Agent Crespo entered the car and sat in the front passenger seat.  (*Id.* at 160:10–

24.)

Agent Crespo identified himself to defendant as an ATF agent and informed defendant that he had a federal warrant for his arrest for being a felon in possession of a firearm. (*Id.* at 161:3–25.) Agent Crespo then read defendant his *Miranda* warnings verbatim from a *Miranda* rights card, reading each and every right as it appeared on the card. (*Id.* at 162:1–23, 165:5–7; *see* Gov. Ex. 6.) After reading the warnings, Agent Crespo asked if defendant understood the warnings, and defendant replied that he did understand. (*Id.* at 163:5–8, 184:4–5.) Defendant gave Crespo no indication that he did not understand his rights, and from all of the circumstances, Agent Crespo believed that defendant understood his rights when they were read. (*Id.* at 164:19–165:1.)

Agent Crespo then asked if defendant was willing to waive his *Miranda* rights and talk to him. (*Id.* at 163:10–11,184:5–11.) Instead of responding "yes" or "no" to this question, defendant said that "he was going to beat the case because the firearm was inoperable." (*Id.* at 163:15–16, 184:12–14, 185:1–4.) At that point, Crespo informed defendant that, under federal law, the firearm did not need to be operable to support a felon-in-possession charge. (*Id.* at 163:22–25, 184:16–19.) Defendant then stated that he did not have any firearm and that he wanted to speak to an attorney, at which point Agent Crespo ended the conversation and did not ask defendant any additional questions. (*Id.* at 164:1–6, 184:20–25.)

At the Pretrial Services office in the federal courthouse, Agent Crespo provided a *Miranda* warning form to defendant, explaining that the form was for defendant to acknowledge that he had been advised of his *Miranda* warnings earlier in the police car and to make a record of those earlier warnings. Defendant acknowledged that this was the purpose of the form. (*Id.* at 165:18–24, 166:12–24, 167:7–8, 15–20; *see* Gov. Ex. 2.) Agent Crespo did not provide this form to defendant at the time he orally advised defendant of his rights because defendant was

handcuffed in the back seat of a car, and the officers did not want to un-cuff him at that time for safety reasons. (*Id.* at 166:6–11.)

After Agent Crespo read defendant the *Miranda* warnings printed on the ATF form and the waiver statement, and defendant read the warnings and waiver statement himself, both Crespo and defendant signed the bottom of the form. (*Id.* at 167:21–168:15; Gov.'s Ex. 2.) Defendant was not handcuffed at this time, and gave Agent Crespo no reason to believe that he did not understand his *Miranda* warnings. Agent Crespo asked defendant no questions from that point on. (*Id.* at 168:22–25, 169:4–6, 173:11–15.)

## VII.    Defendant's Motion to Suppress

By motion filed June 25, 2012 (Doc. No. 22) and supplemented by multiple additional submissions (Doc. Nos. 24, 27, 42, 43 and 51), defendant moved to suppress the following evidence: (1) the gun, magazine, and Officer Fahim's observation of defendant throwing the gun out the window as fruits of an unlawful seizure; (2) the January 19, 2012 statements during transport to the 120th precinct as fruits of an unlawful seizure and because no *Miranda* warnings were given at that time,[4] (3) the January 19, 2012 statements at the precinct as fruits of an unlawful seizure and because defendant did not knowingly and voluntarily waive his rights on January 19; and (4) the January 30, 2012 statements as fruits of an unlawful seizure and because defendant did not knowingly and voluntarily waive his rights on January 30.[5]    At an October 31,

_____

[4] Defendant raised this argument in his original motion to suppress (Doc. No. 22), but did not press this argument in his post-hearing submissions, and in fact appears to concede that admitting the statements would not violate the Fifth Amendment. (*See* Def.'s Post-Hearing Mot. to Suppress (Doc. No. 42) at 23–24.)  Nonetheless, out of an abundance of caution, the Court considers this claim *infra* and finds it to be without merit.

[5] At an October 31, 2012 status conference, defendant suggested that Detective Bergen and Officer Fahim did not give him *Miranda* warnings at all on January 19, 2012.  Likewise, in a letter brief (Doc. No. 27), defendant suggests that Agent Crespo did not advise him of his *Miranda* rights at all on January 30, 2012.  Not having raised these arguments in its post-hearing submissions, defendant has apparently abandoned them.  In any event, the Court finds them to be without merit because defendant was properly advised of his rights and understood the nature of those rights on both January 19 and January 30, 2012, as discussed *infra*.

2012 status conference, defendant withdrew his motion to suppress with respect to the gun, magazine, and Officer Fahim's observations, leaving only the Fourth and Fifth Amendment challenges to the January 19 and January 30 statements.

## CONCLUSIONS OF LAW

**I.    The January 19, 2012 Stop and Arrest**

The Fourth Amendment prohibits unreasonable searches and seizures.  U.S. Const. Amend. IV.  The actions of police in questioning, detaining, or arresting persons suspected of crimes require the appropriate level of suspicion of wrongdoing.  This case involves an encounter between police and a person suspected of criminal activity that escalated from an investigation, to questioning, to a violent struggle that culminated in defendant's arrest.  The Court finds that, given the totality of the evidence presented at the suppression hearing, the police had the requisite level of suspicion of wrongdoing at all times, and that their actions were therefore reasonable under the circumstances.

The parties do not dispute that the encounter in 55 Holland Ave., when Officers Fahim and Pelinku briefly detained defendant to determine whether he was lawfully in the building, constituted a *Terry* stop.  "Under *Terry* [*v. Ohio*, 392 U.S. 1 (1968)], a police officer may briefly detain an individual for questioning if the officer has a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity."  *United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008) (quoting *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991)). "A *Terry* stop is an intermediate response allowing police to pursue a limited investigation when they lack the precise level of information necessary for probable cause to arrest."  *Id.* (quoting *United States v. Elmore*, 482 F.3d 172, 178 (2d Cir. 2007)).  Accordingly, the quantum of suspicion needed to justify a *Terry* stop "is less than a fair probability of wrongdoing, and

considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* at 187 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

In determining reasonable suspicion, the Court must look to the totality of the circumstances to determine whether the officer had a "particularized and objective basis to suspect criminal activity." *Padilla*, 548 F.3d at 187 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). This standard requires that the officer point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Id.* (quoting *Terry*, 392 U.S. at 21) (internal brackets omitted). The officer may not rely on an unparticularized suspicion or hunch, but "is entitled to draw on his own experience and specialized training to make inferences from and deductions about the cumulative information available to him that might well elude an untrained person." *Id.* (quoting *Arvizu*, 534 U.S. at 273). Courts therefore evaluate the circumstances surrounding the stop "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *Id.* (quoting *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000)).

Because the reasonable suspicion determination "must be based on commonsense judgments and inferences about human behavior . . . [e]ven conduct that is as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity." *Padilla*, 548 F.3d at 187 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000); *Villegas*, 928 F.2d at 516). "*Terry* recognized that a series of acts, each of them perhaps innocent in itself, can when taken together warrant further investigation." *Id.* (quoting *Terry*, 392 U.S. at 22) (internal quotation marks and brackets omitted).

Given the totality of the circumstances, Officers Fahim and Pelinku had reasonable suspicion to believe that defendant was trespassing. The officers were responding to a 911 call

indicating that there were five back male trespassers inside 55 Holland Ave., when they encountered two black men in the lobby who admitted they had no business in the building. After instructing those men to leave the building, the officers spoke with the security guard who had placed the 911 call, who indicated that the other trespassers had gone either to the 10th or 12th floor. At this point, the officers were still looking for a group of three black male trespassers, and were specifically directed by the security guard that they might be on the 10th or 12th floor.[6]

On the tenth floor, the officers observed defendant, who is a black man, a second black man, and a black woman loitering in the hallway. It was reasonable for the officers to conclude that defendant and his two associates – the exact number of people for whom the police were searching, and who were loitering on the very floor to which the police had been specifically directed – were the trespassers. Given this combination of factors, that one of the suspects was female did not detract from the officers' particularized and objective basis to believe that they were unlawfully present in the building. Under these circumstances, Officers Fahim and Pelinku had, at the very least, a reasonable suspicion to believe that defendant was committing the crime of trespassing. *See United States v. Pitre*, 294 Fed. App'x 690, 691 (2d Cir. 2008) (finding police officer justified in conducting *Terry* stop based on reasonable suspicion to believe the defendant was trespassing).

At that point, Officers Fahim and Pelinku were entitled to question defendant, and then to temporarily detain him while investigating his claim that he was visiting a resident in Apartment 10L. *See Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cnty.*, 542 U.S. 177, 185

---

[6] Defendant argues that, because the officers did not indicate that the two men in the lobby matched the clothing descriptions given in the 911 call, the officers should have been looking for five trespassers rather than three. Regardless of whether the officers were looking for three or five trespassers at this point, it was reasonable for them to conclude that at least some of the persons in the 10th floor hallway were among the trespassers reported to be on the 10th or 12th floor. *See United States v. Hoskie*, No. 3:99-CR-128, 2000 U.S. Dist. LEXIS 10644, at *13 (D. Conn. July 26, 2000) (noting that "[n]ot every detail" of a tip must be verified to support reasonable suspicion) (citing *Alabama v. White*, 496 U.S. 325, 331 (1990)).

(2004) ("the Court has recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further").[7]  When questioned by the officers, the three individuals indicated that they did not live in the building, giving the officers further suspicion that they might be trespassing and prompting Officer Fahim to knock on the door of apartment 10L to verify whether they were lawfully present in the building.  The woman in 10L's hesitation and defendant's effort to prompt her response − "tell them you know me" − provided ample basis to suggest that defendant may not have been visiting that apartment.  In fact, based on this encounter and its surrounding circumstances, Officer Fahim had valid reason not to believe the woman in 10L when she ultimately stated that she knew defendant.

Moreover, while Officer Fahim knocked on the door of apartment 10L and inquired of its occupant, defendant began pacing in the hallway.  Defendant also turned his body toward the window so that he was facing away from the officers.  Based on defendant's furtive movements during this close-quarters encounter, Officer Pelinku was warranted in drawing his gun and ordering defendant to turn around.  This was a legitimate safety measure meant to protect Pelinku and his partner.  *See generally Adams v. Williams*, 407 U.S. 143, 146 (1972).  Defendant turned at an angle and maintained his hands near his waist.  Moments later, defendant lifted up his sweatshirt, removed a small gun from his waistband, and motioned toward the open window.  Once Officer Fahim saw the gun, the police had probable cause to arrest defendant.[8]  *See United*

---

[7] The Government argues that the police had independent authority to question defendant and investigate his statement because the building was part of the Field Trespass Affidavit Program.  As there was clearly reasonable suspicion to question and temporarily detain defendant, the Court need not reach that separate issue.

[8] Throughout his moving papers, defendant argues that Officers Pelinku and Fahim did not testify credibly, due to various inconsistencies in their testimony.  In particular, defendant suggests that Officer Fahim could not possibly have seen the gun because he could only see defendant's arm.  All of these arguments are without merit.  As noted above, the Court finds the testimony of these officers wholly credible, based on their demeanor on the witness stand and the content of their testimony.  The inconsistencies on which defendant attempts to rely in attacking their

*States v. Vazquez*, 864 F.Supp.2d 221, 229-30 (2d Cir. 2012). Thus, the police conduct comported fully with the requisites of the Fourth Amendment.

## II.    January 19, 2012 Statements

Defendant also seeks to suppress: 1) statements made during his transport to the 120th precinct on January 19, 2012 as fruits of a Fourth Amendment violation, and on Fifth Amendment grounds; and 2) his statements made during the interview with Detective Bergen as fruits of a Fourth Amendment violation and because defendant did not make a knowing and voluntary waiver of his rights. Each of his motions is without merit.

### A.    Fourth Amendment Challenge to Statements Made During Transport to, and in Interview at, the 120th Precinct

Evidence obtained from an unlawful search or seizure is generally subject to exclusion as "fruit of the poisonous tree." *Mosby v. Senkowski*, 470 F.3d 515, 520 (2d Cir. 2005) (quoting *Wong Sun v. United States*, 371 U.S. 471, 484–85, 488 (1963)). Because there was no Fourth Amendment violation with respect to the encounter at 55 Holland Ave. on January 19, 2012, however, neither the statements made during the transport to the 120th Precinct, nor those made to Detective Bergen constitutes fruits of such a violation. *See United States v. Andino*, 343 Fed. App'x 714, 717 (2d Cir. 2009); *United States v. Vassiliou*, 820 F.2d 28, 31 (2d Cir. 1987); *United States v. Molodtsova*, No. 1:08-CR-35-5, 2010 U.S. Dist. LEXIS 17600, at *24–25 (D.

---

credibility are not material. With regard to whether Officer Fahim could see the gun, Officer Fahim testified that he could see defendant at about a 45-degree angle, and that defendant's side and left arm were visible to him. Given the positioning of defendant's body at an angle relative to the two officers, it is entirely plausible, and the Court so finds, that Fahim saw the gun immediately when defendant lifted up his sweatshirt. That Fahim also testified that he used "all the foce he could" to subdue defendant is not undermined by the arrest report in which Fahim indicated that no force was used. As Fahim credibly explained, the "Force Used" section of the arrest report relates only to force greater than that necessary to subdue an individual, such as mace, pepper spray, a police baton or a firearm.

Vt. Feb. 25, 2010); *United States v. Grant*, 427 F. Supp. 45, 50 (S.D.N.Y. 1976). The Court

therefore denies defendant's motion to suppress on Fourth Amendment grounds. [9]

Defendant's remaining claims – challenging the voluntariness of his *Miranda* waivers on

January 19 and 30 – are equally unavailing.

B. Fifth Amendment Challenge to Statements Made During Transport to 120th Precinct

During transport to the 120th precinct, defendant was talking and singing in the patrol car

when *he* initiated conversation with the officers. Defendant began asking Officers Feldman and

Pinho where his gun was, and offered to tell the officers where "other guns" were located.

Officers Feldman and Pinho had not asked defendant any questions up to this point. Because

defendant initiated this conversation and made the statements spontaneously and voluntarily

before the officers asked him any questions, their admission does not violate the Fifth

Amendment even though defendant had not yet been apprised of his *Miranda* rights. *See*

*Miranda v. Arizona*, 384 U.S. 436, 478 (1966) ("Volunteered statements of any kind are not

barred by the Fifth Amendment"); *United States v. Bowden*, 45 Fed. App'x 61, 64 n.1 (2d Cir.

2002); *United States v. Colon*, 835 F.2d 27, 30 (2d Cir. 1987); *United States v. Ayalew*, 563 F.

Supp. 2d 409, 417 (N.D.N.Y. 2008) ("The Second Circuit has long held that incriminatory

statements were admissible without the necessity of finding a *Miranda* waiver where it was

found that such admissions were spontaneous."); *United States v. Carr*, 445 F. Supp. 1383, 1388

(D. Conn. 1978), *aff'd*, 584 F.2d 612, 619 (2d Cir. 1978).

---

[9] As discussed more fully, *infra*, even assuming, *arguendo*, that defendant's arrest on January 19th was somehow improper, any taint from that violation was certainly sufficiently attenuated by January 30th – eleven days later – such that those latter statements were not the fruit of any earlier violation.

C. <u>Fifth Amendment Challenge to Statements Made During Interview at the 120th Precinct</u>

Similarly, the statements made to Detective Bergen were lawfully obtained. Before a suspect is subjected to custodial interrogation, police must inform him of his *Miranda* rights. *Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009). Defendant was read his *Miranda* rights before the interview at the 120th precinct, and indicated that he understood each of those rights. Detective Bergen read verbatim from a *Miranda* rights form, reading each warning to defendant and waiting for defendant to orally confirm that he understood the warning before moving on to the next warning. The warning form contains all warnings required by *Miranda*. *See Miranda*, 384 U.S. at 444–45; (Gov.'s Ex. 1.) After Detective Bergen administered the warnings, defendant marked his initials next to each warning and signed the bottom of the form. Although defendant was apparently impatient at being forced to sit through the warnings, with which he indicated he was already familiar, Detective Bergen told defendant that she had to apprise him of his rights and that she would explain them until he understood them. There was no testimony suggesting that defendant did not understand his rights, or was intoxicated, under the influence of any substance, or otherwise impaired.

"Once an accused is apprised of [his *Miranda*] rights, he may waive them provided the waiver is made voluntarily, knowingly and intelligently." *United States v. Richardson*, No. 09-cr-874, 2010 U.S. Dist. LEXIS 136004, at *10 (E.D.N.Y. Dec. 23, 2010) (internal quotation marks omitted) (quoting *Miranda*, 384 U.S. at 444). Whether the waiver is valid is a two-part inquiry. *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011). First, the waiver must be "knowing," meaning that it "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Second, the waiver must be "voluntary," meaning that it

must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* (quoting *Moran*, 475 U.S. at 421).

To determine whether a waiver is knowing and voluntary, the court must examine the totality of the circumstances surrounding the interrogation, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement. *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991); *Avincola v. Stinson*, 60 F. Supp. 2d 133, 158 (S.D.N.Y. 1999). No single element of an accused's individual characteristics is dispositive, and defendant's intoxication with alcohol or a controlled substance does not preclude a finding of a knowing and intelligent waiver, provided defendant appreciated the nature of the waiver. *Alvarez v. Keane*, 92 F. Supp. 2d 137, 150 (E.D.N.Y. 2000).

Defendant knowingly and voluntarily waived his *Miranda* rights on January 19, 2012. Detective Bergen read defendant his rights, and orally confirmed with defendant that he understood each right. Moreover, there is no evidence in the record suggesting in any way that the conditions of the interview negated defendant's waiver or rendered his statements involuntary, or that the conduct of law enforcement was in any way improper or overbearing.

In his affidavit in support of his original motion papers, defendant indicated that he could not have validly waived his rights on January 19, 2012 because he had been smoking angel dust, was "really high," and did not recall being read his rights or signing a waiver form. (Def.'s Decl. at ¶¶ 3, 7.) Although defendant has not pressed that argument in his post-hearing submissions, the Court addresses it nonetheless and finds it to be without merit. The testimony adduced at the suppression hearing showed that defendant gave appropriate and coherent answers to questions and did not appear to be under the influence of any substance. In addition, Detective Bergen plainly stated that she would not have proceeded had defendant appeared intoxicated, and would

have waited until he was in a condition to speak to her. The fact that an arrest report indicated defendant's complexion was "flushed/ruddy" during processing does not undermine the clear observations of the testifying officers, and does not in any way indicate that defendant was intoxicated, or that he failed to understand the nature of his rights. *See Avincola*, 60 F. Supp. 2d at 160 (holding that defendant's waiver was knowing and voluntary despite physical manifestations of drug use because he was alert, asked the detective to switch from English to Spanish, and acknowledged that he understood his rights).

Defendant also claims that he did not waive his rights because his initials do not appear next to the waiver portion of the form.[10] However, the preponderance of the credible evidence adduced at the suppression hearing clearly shows that defendant made a knowing and voluntary oral waiver, despite his failure to initial the waiver portion of the form. As Detective Bergen credibly testified, she read the waiver question to defendant, defendant responded "yes," and she wrote "yes." Moreover, there is no evidence that defendant attempted to invoke his rights, or did not wish to speak to the officers. To the contrary, the defendants' statements themselves suggest that defendant was confident that he would beat the charges and that he wanted to convey that fact to the arresting and investigating officers.

Defendant further argues that any waiver was not knowing and voluntary because the form used was sloppily drafted, combining the questions "are you willing to answer questions" and "do you understand?" into a single question. (*See* Gov. Ex. 1.) Defendant argues that his oral response therefore indicated only that he understood, not that he also intended to waive his rights. Even assuming that defendant was indicating only his understanding and not his waiver of his rights, defendant's actions during the interview, viewed in full context, demonstrate a

---

[10] This portion of the form reads: "Now that I have advised you of your rights, are you willing to answer questions."

"course of conduct indicating waiver" of his rights. *See Berghuis v. Thompkins*, 130 S. Ct. 2250, 2262–63 (2010) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).  Whether a suspect has implicitly waived his *Miranda* rights is determined on a case-by-case basis from the totality of the circumstances.  *United States v. Brito*, 592 F. Supp. 2d 582, 587 (S.D.N.Y. 2008) (citing *Fare v. Michael C.*, 442 U.S. 707, 725 (1979); *United States v. Gaines*, 295 F.3d 293, 297–98 (2d Cir. 2002)).  The Government bears the burden of proving "by a preponderance of the evidence that the defendant relinquished his rights voluntarily with a full awareness of the rights being waived and the consequences of doing so."  *Id.* (citing *Gaines*, 295 F.3d at 298).

Here, the Government has met that burden.  After listening to his rights and confirming that he understood each right, defendant responded orally that he wished to waive his rights and talk to Detective Bergen.  Defendant proceeded not only to answer Detective Bergen's questions, but asked questions of his own, freely discussing the case without indicating that he wished to invoke his rights or cut off the conversation.  *See Brito*, 592 F. Supp. 2d at 587 (finding implicit waiver where the defendant freely discussed case with police).  In short, nothing about defendant's conduct suggests that he did not intend to waive his rights, and the Government has therefore shown by a preponderance of the evidence that defendant implicitly waived his rights.

Finally, defendant argues that his waiver was invalid because the signature on the January 19, 2012 waiver form is not consistent with a signature that appears on the January 30, 2012 waiver form, or the signature on a New York State Benefit Identification Card.  This argument is without merit because both Detective Bergen and Officer Fahim credibly testified that they saw defendant sign and initial the January 19, 2012 form himself. [11]

---

[11] The Court accords little weight to the signature on the New York State Benefit Identification Card.  The record contains no evidence that the signature on that card was actually written by defendant, and if it was, the circumstances under which the signature was made.  Moreover, defendant's right hand was cuffed to the wall at the time he signed Detective Bergen's rights form.  Finally, it appears from the evidence in the record that defendant

For these reasons, the Court finds that the statements made to Detective Bergen were obtained voluntarily, and after a knowing and voluntary waiver of defendant's *Miranda* rights. As such, all Fifth Amendment challenges to those statements are without merit.

## III. Statements Made to Agent Crespo on January 30, 2012

Defendant argues that the statements he made on January 30, 2012 to Special Agent Crespo should be suppressed because 1) they were the fruits of a prior Fourth Amendment violation, and 2) because defendant did not knowingly and voluntarily waive his *Miranda* rights on January 30, 2012.

### A. Fourth Amendment Challenge and Attenuation

The January 30, 2012 statements were not fruits of a prior Fourth Amendment violation because, as discussed *supra*, no Fourth Amendment violation occurred on January 19, 2012. *See Andino*, 343 Fed. App'x at 717. Even assuming, *arguendo*, that defendant's arrest on January 19 was somehow improper, any taint from that violation was sufficiently attenuated by January 30th – eleven days later – such that those latter statements were not the fruit of any earlier violation. *See Mosby v. Senkowski*, 470 F.3d 515, 522 (2d Cir. 2005). [12]

---

does not sign his name in one consistent fashion, as evidenced by his two declarations (Docs. No. 22 Ex. A & 27 Ex. A), the waiver forms (Gov. Exs. 1–2), and the benefits card (Def.'s Ex. MM).

[12] Defendant also asserts that his case was "federalized in order to secure [defendant's] cooperation with ongoing state investigations, which would render the January 30, 2012 statements the product of exploitation of the illegality of the initial stop." (Doc. No. 27 at 2–3.) There is nothing in the record to support this argument. Moreover, as discussed above, the events of January 30 were sufficiently attenuated from those of the initial stop and arrest given, *inter alia*, their lack of temporal proximity to one another, the intervening state court proceedings, and the administration of *Miranda* warnings by Agent Crespo. Second, to the extent that defendant intends this to be an independent claim that federal prosecutors acted improperly by coercing defendant to testify regarding state investigations, such claim is belied by the evidence adduced at the suppression hearing. Detective Bergen indicated that her intent on January 19 was to inquire about the events of that evening and "to ascertain where the defendant got the gun from," not to question defendant regarding past crimes. (Tr. at 145:13–23, 155:11–13.) Agent Crespo did not recall discussing any cooperation with defendant, and there is nothing in the record to elucidate the reasons for defendant's transfer to federal custody. (*Id.* at 176:22–177:5.)

### B. Defendant Waived His *Miranda* Rights on January 30, 2012

Defendant again claims that that he did not give a knowing and voluntary waiver on January 30, 2012. His argument here also misses the mark.

First, defendant was not subject to interrogation when he made the January 30 statement to Agent Crespo. Interrogation includes express questioning, as well as police words or actions – other than those normally attendant to arrest and custody – that the police should know are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Rosa v. McCray*, 396 F.3d 210, 220–21 (2d Cir. 2005). "[S]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions . . . interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301–02 (emphasis in original).

Here, after identifying himself to defendant and indicating that defendant was being arrested on federal charges, Special Agent Crespo read defendant his *Miranda* rights from an advice of rights card and confirmed with defendant that he understood the warnings. Crespo then asked defendant if he was willing to waive his *Miranda* rights and talk with Crespo. Far from asking defendant questions designed to elicit incriminating evidence, Crespo was trying to ascertain "whether [defendant] wished to invoke or waive his *Miranda* rights." *United States v. Yago*, No. 06-cr-16-1, 2007 WL 1555775, at *4 (D. Vt. May 16, 2007) (adopting R&R) ("even assuming [defendant's] first statement was in response to [the officer's] waiver question, the statement was not made in response to interrogation . . . because [the officer's questions] were designed to clarify whether or not [defendant] wanted to discuss the case and were not reasonably likely elicit an incriminating response") (internal quotation marks omitted); *see*

*also Innis*, 446 U.S. at 301.  The fact that defendant made an incriminating statement in response to this question does not turn the question into an interrogation.  *See Yago*, 2007 WL 1555775, at *4.

Second, even assuming defendant was subject to custodial interrogation, defendant's conduct amounted to an implicit waiver of his rights.  Defendant was informed of his *Miranda* rights, and indicated to Agent Crespo that he understood his rights.  When Agent Crespo asked defendant if he was willing to waive his rights, defendant did not remain silent or decline to waive his rights, but instead responded by stating that he was going to beat the case because the firearm was inoperable.  This response plainly suggests that defendant wanted to engage Agent Crespo in a colloquy about his case.  *Cf. Brito*, 592 F. Supp. 2d at 587 (holding that defendant implicitly waived his rights when, after officer asked if he would cooperate, defendant asked questions about the charges against him).  Defendant's own conduct demonstrates that he chose to engage Agent Crespo in a conversation about his case rather than invoke his rights, and amounted to a "course of conduct indicating waiver."  *See Berghuis*, 130 S. Ct. at 2262–63; *Brito*, 592 F. Supp. 2d at 587 (citing *United States v. Dosanjh*, No. 08 Cr. 211, 2008 U.S. Dist. LEXIS 100454, at *11–14 (S.D.N.Y. Dec. 11, 2008)).  Defendant's later invocation of his right to counsel after Agent Crespo informed him that operability was not required for a federal felon in possession charge further indicates that defendant fully understood his rights at the time he made his incriminating statement, and did not invoke those rights until after making that statement.  Once defendant invoked his right to counsel, Agent Crespo properly cut off questioning.  At all turns, Agent Crespo acted properly, and defendant's rights were in no way violated. Thus, all statements made to Agent Crespo are admissible.

**CONCLUSION**

Defendant's motion to suppress (Doc. No. 22) is denied in its entirety.

SO ORDERED.

Dated:  Brooklyn, New York
        February 3, 2014

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge